IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| INTEGRATED PHYSICIAN SOLUTIONS, f.k.a. DAYTON INFANT CARE SPECIALISTS, INC., | : | |
| | : | |
| Plaintiff, | : | Case No. 3:06cv377 |
| vs. | : | JUDGE WALTER HERBERT RICE |
| DON T. GRANGER, M.D., *et al.*, | : | |
| Defendants. | : | |

---

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANTS
YOHANNAN, RONE, HAAS AND DAYTON NEWBORN CARE
SPECIALISTS, INC. TO DISMISS (DOC. #22) AND OVERRULING, AS
MOOT, MOTION OF DEFENDANTS YOHANNAN, RONE, HAAS AND
DAYTON NEWBORN CARE SPECIALISTS, INC. FOR PROTECTIVE
ORDER (DOC. #28)

---

Plaintiff, Integrated Physician Solutions ("IPS"), brings suit alleging various

wrongdoings against Defendants Don T. Granger, M.D. ("Dr. Granger"), M. David

Yohannan, M.D. ("Dr. Yohannan"), Jerod M. Rone, M.D. ("Dr. Rone"), Marjorie M.

Haas, M.D. ("Dr. Haas"), and Dayton Newborn Care Specialists, Inc. ("Dayton

Newborn").  Drs. Granger, Yohannan, Rone and Haas are neonatologists.  At the

time of the events in dispute, Dr. Granger was the sole shareholder, as well as an

officer and director of Dayton Infant Care Specialists, Corp. ("DICSC"), a

professional medical corporation that provided services to various hospitals, in the

Dayton, Ohio area. Doc. #36 ¶¶ 6, 85. The other three physicians, Drs.

Yohannan, Rone and Haas (referred to collectively as, the "Physicians"), were

DICSC employees. Dayton Newborn Care Specialists, Inc., is a professional

medical corporation that Dr. Yohannan subsequently incorporated and of which the

Physicians are currently shareholders and/or employees. Id. ¶ 33.

IPS and DICSC had previously entered into an arrangement whereby IPS

agreed, among other things, to manage and administer DICSC's pediatric medical

clinics.[1] It is the break-down of this agreement between IPS and DICSC that is the

genesis of the present litigation.

Presently before the Court are two Motions by the Physicians and Dayton

Newborn (collectively, the "Defendants"),[2] to wit: a Motion to Dismiss (Doc. #22)

and a Motion for a Protective Order (Doc. #28). The Court will address each

Motion in turn.[3]


I.    FACTS

In January, 1999, DICSC and IPS entered into a management services

---

[1]Actually, it was IPS's predecessor that entered into the Agreement with DICSC. Doc. #36 ¶¶ 14, 16. To reduce confusion, however, the Court will refer to the current parties to the agreement in question, IPS and DICSC.

[2]The remaining Defendant, Dr. Granger, has also filed a Motion to Dismiss (Doc. #32), which the Court will consider in a separate Opinion.

[3]The Court has jurisdiction over these parties, under the diversity provisions of 28 U.S.C. § 1332.

agreement ("DICSC/IPS Agreement" or "Agreement"),[4] wherein IPS agreed "to manage and administer pediatric medical clinics and to furnish pediatric medical practices with offices, facilities, equipment, supplies, support personnel and management and financial advisory services" for DICSC. Doc. #36 ¶ 17. DICSC's obligations under the Agreement included "recruit[ing] and hir[ing] physician employees to staff [the] pediatric medical clinics and pediatric medical practices and . . . obtain[ing] and enforc[ing] formal written employment agreements with the physician shareholder and with all present and future physician employees of [DICSC]." Id. ¶ 18. DICSC further agreed to maintain professional neonatology service relationships with certain medical facilities, to include The Children's Medical Center ("CMC") and Greene Memorial Hospital ("GMH"). Id. ¶ 21. The term of the Agreement was 40 years and was terminable by DICSC only if IPS materially breached the Agreement or filed for bankruptcy. Id. ¶ 19.

As required by the Agreement, DICSC subsequently entered into written employment agreements with the Defendant Physicians. Among other provisions, each such agreement contained a non-complete clause, which forbade them from competing with DICSC. Id. ¶ 82. This provision was required by the DICSC/IPS Agreement. Id.

In August 2006, Dr. Granger notified the Physicians that he planned to

---

[4]The DICSC/IPS Agreement is attached to the Amended Complaint as Exhibit A. Doc. #36, Ex. A.

resign and solicited their interest in purchasing DICSC. Id. ¶ 31. Apparently receiving no interest in his offer, Dr. Granger notified IPS, by letter dated October 2006, that he had engaged counsel to assist him in the dissolution of DICSC.[5] Id. ¶ 82.

Subsequently, Dr. Granger and the Physicians agreed that the Physicians would not be bound by the terms of their non-compete agreements. Id. ¶ 73. The Physicians then entered into contracts, either individually or through Dayton Newborn, to provide services to some of the hospitals that were formerly under contract with DICSC, using the same offices and substantially the same equipment that DICSC had previously used. Id. ¶¶ 75, 85. At the same time, DICSC ceased furnishing physicians to provide medical services at the hospitals. Id. ¶ 75.

IPS asserts that the Defendants' actions, as set forth above, harmed it, in general, because DICSC was then prohibited from fulfilling its obligations to IPS, under the terms of DICSC/IPS Agreement. See generally id.


II.     STANDARD FOR RULING ON MOTION TO DISMISS

The Supreme Court recently issued two cases wherein it refined the standards a court must use when faced with a motion to dismiss, under Rule 12(b)(6).

---

[5]Specifically, Dr. Granger's letter, which is attached to the Amended Complaint as Exhibit B, provides that, as of December 1, 2006, he would be leaving CMC to take an out-of-state academic position. Doc.#36, Ex. B.

4

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

Erickson v. Pardus, __ U.S. __, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2) and Bell Atlantic Corp. v. Twombly, 550 U.S. __, 127 S. Ct. 1955 (2007); some citations omitted). The Court further explains that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964-65 (citation omitted). On this point, the Sixth Circuit expounds by pointing out that although a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Twombly, 127 S. Ct. at 1965).

As to the kinds of documents a Court may consider when ruling on a motion to dismiss, under Rule 12(b)(6), the Federal Rules note that a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. Proc. 10(c). Thus, the court may properly consider any documents attached to a plaintiff's complaint, when ruling thereon. If a plaintiff chooses not

to attach certain pertinent documents to the complaint, however, a defendant may introduce those documents for the court's consideration. City of Monroe Employees Ret. System v. Bridgestone Corp., 399 F.3d 651, 659 n.6 (6th Cir. 2005). "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim."[6] Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997) (quoting Venture Assoc. v. Zenith Data Sys., 987 F.2d 429, 431 (7th Cir. 1993)); see also Commer. Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007).

III.    ANALYSIS

    The Plaintiff asserts six claims against the Physicians and/or Dayton Newborn, to wit:  (1) tortious interference with the DICSC/IPS Agreement, against the Physicians and Dayton Newborn (Count IV); (2) breach of the Physicians' non-compete agreements with DICSC, against the Physicians (brought as a third party beneficiary) (Count V); (3) conversion, against the Physicians and Dayton Newborn (Count VI); (4) conspiracy, against the Physicians and Dayton Newborn (Count

---

[6]The Defendants, in this case, have attached the following documents to their Motion to Dismiss, all of which  are referred to in the Plaintiff's Amended Complaint and are central to the Plaintiff's claims:  Employment Agreement of M. David Yohannan (Exhibit A), Employment Agreement of Jared M. Rone (Exhibit B), and Services Contract of Marjorie Haas, M.D. (Exhibit C).  The Court will, thus, consider these as part of the pleadings when ruling herein.

VII), (5) for an accounting, against the Physicians and Dayton Newborn (Count

VIII); and (6) successor liability, against Dayton Newborn (Count IX). Doc. #36 ¶¶

70-102. The Court will address each such claim, in the order listed.


      A.   <u>Tortious Interference with Contract (Count IV)</u>

In its fourth claim for relief, the Plaintiff alleges that the Defendants

tortiously interfered with the DICSC/IPS Agreement, principally by agreeing to not

be bound by their non-compete agreements with DICSC, after they learned that

Granger planned to resign and either sell or dissolve DICSC. Doc. #36 ¶¶ 24, 31,

70-73. As previously explained, DICSC was obligated to have such agreements

with the Physicians, under the terms of the DICSC/IPS Agreement. The Amended

Complaint further alleges that as a result of these actions, DICSC failed to provide

physicians to furnish medical services and, thus, failed to perform its obligations

under the DICSC/IPS Agreement, implying that such actions harmed the Plaintiff,

since it did not receive the benefits that would have flowed to it had DICSC

performed its obligations for the term of the Agreement in question. Id. ¶ 74.

The basic principle of a tortious interference claim is that "one who, without

a privilege to do so, induces or otherwise purposely causes a third party not to

enter into, or continue, a business relationship with another, or perform a contract

with another is liable to the other for the harm caused thereby." <u>Heheman v. E. W.</u>

7

Scripps Co., 661 F.2d 1115, 1127 (6th Cir. 1981) (citing Juhasz v. Quik Shops, Inc., 55 Ohio App.2d 51, 379 N.E.2d 235 (1977)); see also Barilla v. Patella, 144 Ohio App. 3d 524, 532, 760 N.E.2d 898 (Ohio Ct. App. 2001) (same principle). According to the Ohio Supreme Court, the elements of a claim for tortious interference with contract are: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 707 N.E.2d 853, syl. ¶ 1 (1999) (affirming Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 650 N.E.2d 863, syl. ¶ 2 (1995)). As to the fourth element, "lack of justification," the Court further explains that the interference must be both intentional and improper to be actionable. Id. at 177 (citing Kenty, 72 Ohio St. 3d at 418-19).

Courts usually analyze the "lack of justification" element in the reverse by determining whether an actor "has justification" to purposely cause another not to perform a contract or, more commonly, whether the person is "privileged" to do so. E.g., Wright v. MetroHealth Medical Ctr., 58 F.3d 1130, 1139 (6th Cir. 1995). In order to determine if a party is privileged to interfere with another's contract, the Ohio Supreme Court provides the following guidelines, which it adopted from Section 767 of the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d)

8

> the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

Id. at 178-79. In interpreting these factors, the Sixth Circuit has indicated that the first factor (the nature of the actor's conduct) is the "chief factor" that courts should consider, and that it requires a showing that the actor had a specific intent to harm, in order to be actionable. Super Sulky, Inc. v. United States Trotting Ass'n, 174 F.3d 733, 742-43 (6th Cir. 1999) (citing Restatement (Second) of Torts § 767 cmt. c).

While an analysis of these Restatement factors may require some factual inquiry, "the ultimate question of whether an interference is improper and can, thus, support a claim for intentional interference is a question of law." Midland Am. Sales-Weintraub v. Osram Sylvania, Inc., 874 F. Supp. 164, 167 (N.D. Ohio 1995) (citing Kand Medical, Inc. v. Freund Medical Products, Inc., 963 F.2d 125, 128-29 (6th Cir. 1991)). Whether a complaint sets forth sufficient allegations regarding the elements of a tortious interference claim and, in particular, the Restatement factors, is an appropriate determination for a court when ruling on a Rule 12(b)(6) motion. Wright, 58 F.3d at 1139 (affirming dismissal upon finding that plaintiff did not allege facts sufficient to demonstrate the fourth element of plaintiff's tortious interference claim, lack of justification, in light of the Restatement factors); see also Easy Way, Inc. v. Transp. Int'l Pool, Inc., 2003 U.S. App. LEXIS 10658, *11

(6th Cir. 2003) (affirming dismissal of complaint, because plaintiff failed to allege facts to support a finding on the third element of Michigan's tort of intentional interference of contract, which required that plaintiff allege "the intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another").

The Court finds that the Amended Complaint, in this case, does not establish the Plaintiff's entitlement to relief respecting the fourth element of the Plaintiff's tortious interference claim - - lack of justification or privilege. In so finding, the Court looks to two Sixth Circuit cases, with substantially similar facts.

In Heheman v. E.W. Scripps Co., the defendant newspaper publisher had previously entered into an agreement with the plaintiff collective bargaining unit, under which the publisher agreed to guarantee certain employees ("printers") lifetime employment. 661 F.2d 1115, 1118 (6th Cir. 1981). Faced with mounting financial difficulties, the publisher entered into an agreement with another publication company to consolidate certain operations, including the printing operations of the newspapers. Id. at 1119. As part of that agreement, the original publisher closed its composing room, which necessitated the firing of all of its printers. Id. The printers sued the original publisher for breach of contract and the new publisher for tortious interference with contract. Id. Specifically, as to the tortious interference claim, the printers argued that the new publisher wrongfully

10

interfered with the lifetime employment agreements by negotiating a provision, in the new agreement between the publishers, wherein the new publisher would use its own employees to perform all operations involved in printing the newspapers. Id. at 1126.

The District Court granted summary judgment in favor of the new publisher, on the tortious interference claim, and the Sixth Circuit affirmed. Id. at 1126-28. In so doing, the Court balanced the Restatement factors and concluded that two points were salient:  "the clear absence of malicious intent on the part of the [new publisher]" and the social interest served by the publishers' agreement (to preserve the publication of economically distressed local newspapers by consolidating operations). Id. at 1128.  In clarifying the first point, the Court noted that,

> [the new publisher's] purpose seems clearly to have been the avoidance of the burden of the [the previous publisher's] contractual obligations rather than the deprivation of plaintiffs' rights.  Had [the previous publisher] been able to provide plaintiffs with other employment, the [new publisher's] interests would have been equally served.  Given its legitimate desire to use labor efficiently, the [new publisher] was effectively faced with a choice between its own and [the old publisher's] printers.

Id.  The same can be said here.  The Amended Complaint alleges only that the Physicians, like the new publisher in Heheman, had no desire to take on the burdens of DICSC's contractual obligations and yet wanted to remain gainfully employed, but in no way can be read to allege that their purpose or goal was to deprive IPS of its rights under the DICSC/IPS Agreement.  The long and the short

11

of it is that the Physicians' employer (DICSC) informed them that the business was for sale and, for whatever reason, the Physicians were not interested in purchasing the business.  They, of course, were under no obligation to do so.  The employer then began the process of dissolving the business.  As a result, the Physicians were without work.  DICSC agreed to release them from their non-compete restrictions so they would be free to seek other employment, which they did.  Nothing in the Amended Complaint can be read to imply that the Physicians (or, later, Dayton Newborn) took these steps with a "specific intent to harm" IPS.  On the contrary, the Amended Complaint alleges that the Physicians' actions were "for their own personal benefit." Doc. #36 ¶ 32.

The Court turns now to a later Sixth Circuit case, Wright v. MetroHealth Medical Center, 58 F.3d 1130 (6th Cir. 1995).  In Wright, the female plaintiff was a nurse, who was employed by the defendant hospital, MetroHealth, and the male plaintiff was a helicopter pilot, who was employed by PHI - a company that contracted with MetroHealth to man its LifeFlight unit. Id. at 1132.  The plaintiffs were both assigned to the same unit. Id.  At some point in time, the plaintiffs married and the hospital requested that PHI transfer the husband from the LifeFlight unit, based on the hospital's understanding that the plaintiffs' working arrangements violated the hospital's nepotism policy. Id. at 1133.  The plaintiffs brought suit against the hospital alleging, among other things, that the hospital tortiously interfered with the husband's business relationship with PHI. Id.

12

The Appellate Court affirmed the district court's dismissal of the plaintiffs' claim, concluding that the hospital was privileged (*i.e.*, had justification) to interfere with the husband's business relationship by virtue of its contract with the husband's employer. Id. at 1139.  "Pursuant to this contract, PHI supplied pilots to MetroHealth for its LifeFlight unit.  Thus, MetroHealth had an interest in the employees that PHI provided MetroHealth." Id.  In essence, the Sixth Circuit determined that the plaintiffs had not made sufficient allegations pertaining to the fourth element of their tortious interference claim, lack of justification, to overcome the inference of privilege that arose because of the secondary business relationship that existed between the hospital and PHI, pursuant to which the hospital had the right to monitor the employees PHI provided to staff its LifeFlight operations.

The Wright case is significant in that the Appellate Court determined that the alleged interloper in that case (the hospital - MetroHealth) was justified in its interference, because it was protecting its own business interest.  As previously stated, if the intruder's motivation is not based on a specific intent to harm, then the claim must fail.

Likewise, the Amended Complaint, in this case, does not contain factual allegations sufficient to raise the Plaintiff's right to relief above the speculative level, as to whether the Physicians or Dayton Newborn interfered with the DICSC/IPS Agreement with a specific intent to harm IPS.  Rather, the Defendants' actions (like the actions of the hospital, in Wright) were clearly geared toward

13

protecting their personal business interests, rather than to harming IPS. Thus, IPS's claim that the Defendants tortiously interfered with the Agreement must fail.[7] The Defendants' Motion to Dismiss (Doc. #22) is, therefore, SUSTAINED, as to Count IV.


B.    Physicians' Breach of Employment Agreements with DICSC (Count V)

In its fifth claim for relief, IPS, as an alleged third party beneficiary, brings suit claiming that the Defendant Physicians breached their non-compete contracts with DICSC by entering into separate contractual relationships with the various medical facilities serviced by DICSC, once they learned of DICSC's plans to dissolve. Doc. #36 ¶¶ 34, 36, 80-87. IPS alleges that it was an intended beneficiary under the non-compete agreements between DICSC and the Physicians, because the DICSC/IPS Agreement required that DICSC maintain such non-compete agreements with the physicians under its employ. Id. ¶ 82.

Among other arguments, the Physicians make the following two, both of which the Court finds persuasive: (1) although they admittedly did enter into other employment arrangements once they learned of DICSC's intent to dissolve, the Physicians did not actually violate the terms of their non-compete agreements

---

[7]It is not even clear to the Court that the Defendants, in this case, actually interfered with the operation of the Agreement. The ruling herein is simply that, upon a hypothetical determination that the Defendants did so interfere, they would have been privileged to do so.

14

(Doc. #22 at 11-13; Doc. #27 at 8-10), and (2) even if they did violate the terms of those agreements, in order to enforce said agreements, DICSC (and therefore, IPS, as a third party beneficiary) must have a "legitimate business interest" in enforcing the same, which it no longer has given its plans to dissolve (Doc. #22 at 13-15; Doc. #27 at 10-11).

As to the Physicians' first argument, they point out that the contracts of Drs. Yohannan and Rone only restrict them from competing against DICSC, if they quit their employment with DICSC, rather than if they are terminated by DICSC, as is the present situation. Doc. #22 at 11-13; Doc. #27 at 8-9. The two Physicians point to the following identical terms in their non-compete agreements, in support of this argument:

> If Employee terminates employment with the Corporation for any reason, then for a period of one (1) year after such termination, Employee will not be permitted to take any position with any health care institution or private medical practice involving competition with the Corporation within the area of non-competition described in the [Children's Medical Center] Agreement.

Doc. #22 at 11-12 (citing Ex. A, Art. 5.1; Ex. B, Art. 5.1) (emphasis added). The Court agrees that the terms of the DICSC employment agreements with Drs. Yohannan and Rone do not restrict the doctors from entering into other employment arrangements, unless the doctors initiate the termination of their employment, which is not the case in the present situation.

The non-compete provision in Dr. Haas's employment contract is different

15

than the other two doctors.  In pertinent part, it reads as follows:

> For a period of TWO YEARS after the later of Physician's termination of employment with Corporation or the expiration of this Contract, Physician agrees [that she] will not, directly or indirectly, render medical or consulting services at [Community Hospital of Springfield ("CHS")], as an independent physician or employee of any entity including, without limitation, [CHS], in the area of neonatology, pediatrics, or any other type of service or professional practice similar to the practice conducted by [DICSC] as of the termination date of Physician's employment.

Doc. #22, Ex. C § 12.1 (emphasis added; capitalization in original).  Dr. Haas argues that the terms of this contract only restrict her from competing at CHS, not at CMC or GMH, and that the Amended Complaint alleges that Dr. Haas breached the non-compete agreement by entering into an agreement with CMC. Doc. #27 at 9-10; see also Doc. #36 (Am. Compl.) at 14, ¶¶ 85-86.[8]  IPS responds by asserting that the Amended Complaint actually provides that Dr. Haas entered into agreements with "CMC and other facilities that formerly were under contract with [DICSC]," thereby claiming that the Physicians have been overly restrictive in their reading of the Amended Complaint. Doc. #26 at 26-27 (citing Doc. #36 (Am. Compl.) ¶ 85).

IPS is correct in noting that the language in the Amended Complaint indicates that, after learning of DICSC's plan to dissolve, Dr. Haas (and the other

---

[8]The Amended Complaint contains redundancy in some of the paragraph numbering. See Doc. #36 at 14-15.  The Court will refer to both the page numbers and the paragraph numbers, to the extent necessary to avoid confusion.

Physicians) entered into agreements with "CMC and other facilities that formerly were under contract with [DICSC]." Doc. #36 at 14, ¶85. However, in a later paragraph pertaining to the alleged breach of the non-compete agreements, the Amended Complaint asserts that the Physicians breached these agreements by "planning and preparing to enter into an agreement with CMC and GMH," but does not mention "CHS or other facilities." Id. at 14, ¶ 86.[9] Since CHS was the only hospital with which Dr. Haas was contractually obligated to not compete and since the Amended Complaint does not allege that Dr. Haas breached her non-compete agreement by later entering into another employment arrangement with CHS, the Physicians' argument here is well taken.

However, even given an expansive reading of the Amended Complaint and assuming that it properly alleges that Dr. Haas breached the non-compete by later entering into a competitive agreement with CHS, the Plaintiff still does not have a valid claim for breach of contract. A third party beneficiary does not have greater

_____

[9]Paragraphs 85 and 86 of the Amended Complaint read as follows:

85.   Physicians have, upon information and belief, entered into contracts individually or through their newly formed entity, Dayton Newborn, to provide services to CMC and other facilities that formerly were under contract with [DICSC].

86.   Physicians' activities in planning and preparing to enter into an agreement with CMC and GMH, directly and materially breached their employment agreements.

Doc. #36 at 14.

rights to enforce an agreement than have the actual parties to the agreement. Res.

Title Agency, Inc. v. Morreale Real Estate Servs., 314 F. Supp. 2d 763, 770 (N.D.

Ohio 2004) (noting that "third party beneficiaries are generally subject to the same

contract defenses available against the contracting parties themselves"); Noe v.

R.D. Jones, Excavating, Inc., 787 F. Supp. 759, 763 (S.D. Ohio 1992) (same);

Union Sav. & Loan Co. v. Cook, 127 Ohio St. 26, 186 N.E. 728, syl. ¶ 1 (1933)

(noting that a third party beneficiary "acquires no greater rights than are set forth

in the agreement"); Ohio Sav. Bank v. H. L. Vokes Co., 54 Ohio App. 3d 68, 71,

560 N.E.2d 1328 (Ohio Ct. App. 1989) (relying on Union Savings and Loan, 127

Ohio St. 26, for same proposition).

Based on this premise and assuming, without deciding, that IPS is a third

party beneficiary of the non-compete agreements between DICSC and the

Physicians, IPS does not have a greater right to enforce the non-compete

agreements than has DICSC.  In order for DICSC to enforce the agreements with

the Physicians, it must have a "legitimate business interest" in doing so. Raimonde

v. Van Vlerah, 42 Ohio St. 2d 21, 25-26, 325 N.E.2d 544 (1975).  This, it no

longer has, given its plans to dissolve.

Ohio courts have been clear in holding that "employer[s] who withdraw[]

from a market segment may not enforce a non-compete covenant against former

employees who seek to compete in that segment." Klaus v. Kilb, Rogal & Hamilton

Co. of Ohio, 437 F. Supp. 2d 706, 733 (S.D. Ohio 2006); see also Premier

18

Assocs., Ltd. v. Loper, 149 Ohio App. 3d 660, 669, 778 N.E.2d 630 (Ohio 2nd
Dist. Ct. App. 2002); Premier Health Care Servs. v. Schneiderman, 2001 Ohio
App. LEXIS 5935 (Ohio 2nd Dist. Ct. App. 2001).  IPS argues that DICSC has not
yet actually dissolved, but, instead, has only indicated its intention to dissolve.
Doc. #26 at 27-18 (citing Doc. #36 (Am. Compl.) ¶ 24). The Court does not find
this argument persuasive.

Ohio's Second District Court of Appeals was recently faced with a similar
question.  In Premier Associates, Ltd. v. Loper, the employer, Premier (an
organization that provided mental health care services to nursing homes), had
notified both its employees and its contracting agencies that it intended to go out
of business. 149 Ohio App. 3d 660, 664, 778 N.E.2d 630 (Ohio 2nd Dist. Ct. App.
2002).  The defendant employee (a psychologist) then entered into another
employment arrangement that was in direct violation of his previous non-compete
agreement with Premier. Id. at 665.  Shortly thereafter, Premier changed its mind
and decided to sell its business rather than cease doing business altogether. Id.
Premier then commenced suit against the psychologist, alleging breach of the non-
compete contract, among other claims.

The question the Court initially faced was whether Premier had "gone out of
business" before the psychologist entered into the new employment agreement. Id.
at 668.  The Court decided that it had not, but that this decision was not
determinative of whether it was reasonable to enforce the agreement. Id.  "In other

19

words, the sale of the business had no effect upon the enforceability of the covenant." Id. Rather than using the operational status of the business as an arbitrary bright line, the Court instead looked to whether Premier had a legitimate business interest in enforcing the non-compete agreement once it announced its intention to go out of business. In so doing, the Court relied on the following legal premise:

> The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing unfair competition - not ordinary competition. Therefore, the agreement must be reasonable before it will be enforced, and there must be a weighing of the interests of the employer, the employee, and the public to determine what is reasonable. If there is no legitimate interest of the employer to protect, then any non-competition agreement is not reasonable.

Id. at 667 (quotation and citation omitted). Although Premier asserted that several of its interests (including maintaining customer good will) were "legitimate business interests," the Court ultimately determined that once Premier announced its intention to abandon its business, it had "abandoned its competitive interest in servicing the nursing homes in question," and thus had no legitimate business interest in enforcing the non-competes. Id. at 670. In so doing, it cited favorably a Colorado appellate court case, which noted that "the right to enforce a covenant ends with the termination or abandonment of the business to which the covenant was ancillary. Such abandonment extinguishes the covenant." Id. at 669 (citing Gibson v. Eberle, 762 P.2d 777, 779 (Colo. App. 1988)).

The same can be said here. Once DICSC notified its employees and IPS that

20

it intended to dissolve, it had no legitimate business interest in enforcing the non-compete agreement with the employee Physicians.  Since DICSC could not enforce the agreements, IPS, as a potential third party beneficiary, has no right to enforce the agreements either.  The Defendants' Motion to Dismiss (Doc. #22) is, therefore, SUSTAINED, as to Count V.


C.  Conversion (Count VI)

In its sixth claim for relief, IPS alleges that the value and benefit it received from the DICSC/IPS Agreement were derived, in part, from DICSC's provision of services to the various hospitals with which it had contractual relationships. Doc. #36 at 15, ¶¶ 84-88.  IPS further alleges that the Physicians, either individually or through Dayton Newborn, have entered into agreements with some of these hospitals and have, thus, "wrongfully and intentionally converted [DICSC's] contract with CMC and other facilities and have further converted the value, benefit and other rights accruing to Plaintiff as a result of [DICSC's] performance of its contracts per the Agreement for their own use." Id. at 15, ¶¶ 85-86.

Conversion is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." State Farm Mut. Auto. Ins. Co. v. Advanced Impounding & Recovery Servs., 165 Ohio App. 3d 718, 722, 848 N.E.2d 534 (Ohio Ct. App. 2006) (quoting Joyce v. General Motors Corp., 49 Ohio St.3d 93,

21

96, 551 N.E.2d 172 (1990)). The elements of a conversion claim are: "(1) a defendant's exercise of dominion or control, (2) over a plaintiff's property, (3) in a manner inconsistent with the plaintiff's rights of ownership." Id. (citation omitted).

Although not couching its arguments in terms of the conversion elements, IPS seems to be arguing that the "property" over which the Defendants exercised improper dominion or control was (1) DICSC's contract with "CMC and other facilities," and (2) the "value and benefit" that would have accrued to the Plaintiff under the terms of the DICSC/IPS Agreement, but for the Defendants' interference (with such "value and benefit" coming from "[DICSC's] continued operation as an ongoing business concern").[10] Doc. #26 at 31; see also Doc. #36 (Am. Compl.) at 15, ¶ 86. IPS further argues that the Physicians and Dayton Newborn exercised improper dominion or control over this "property," as a result of the "[d]estruction of [DICSC] as an ongoing business, of which [the Physicians] played a crucial part." Doc. #26 at 32.

IPS's claim lacks merit, because it has not identified a recognizable property interest for the Defendants to have converted. As to "DICSC's contract with CMC and other facilities," IPS clearly has no property interest. As to the "'value and benefit' that would have accrued to the Plaintiff under the terms of the DICSC/IPS Agreement, but for the Defendants' interference," the Court has previously decided

---

[10]Although IPS initially appears to be alleging conversion as to these two separate property interests, it then melds the interests, thereafter focusing only on the second stated interest.

22

that the Defendants did not wrongfully interfere in the performance of the DICSC/IPS Agreement. With no wrongful interference, IPS is left without an argument, on this point.

It seems clear to the Court, at this juncture, why IPS did not make a more straightforward argument here and attempt to apply the recognized elements of a conversion claim. There is an awkwardness that pervades both IPS's Amended Complaint and Memorandum. In several of its claims, such as this one, it appears as if IPS has tried to turn facts that would seemingly fit rather well into a run-of-the-mill breach of contract claim against DICSC into claims that do not fit well at all against the present Defendants. As the saying goes, it feels as if IPS is trying to put a round peg into a square hole.

That being said, the facts here belie the implication that the Defendants converted IPS's assets. At the outset, Dr. Granger decided to cease operating DICSC. He informed his employees (the Physicians) of this decision. The Physicians then made other arrangements for employment, at their respective hospitals. As IPS properly states, any interest it had in the DICSC/IPS Agreement was derived from "DICSC's continued operation as an ongoing business concern." Any property interest IPS had in DICSC's continued business operations, then, ceased with Dr. Granger's decision to dissolve that entity.

Because the factual allegations are not sufficient to raise the Plaintiff's right to relief, on its conversion claim, above the speculative level, the Defendants'

23

Motion to Dismiss (Doc. #22) is SUSTAINED, as to Count VI.


      D.    Conspiracy (Count VII)

    IPS's seventh claim for relief is for civil conspiracy. Doc. #36 ¶¶ 89-92.  A

civil conspiracy is a "malicious combination of two or more persons to injure

another person or property, in a way not competent for one alone, resulting in

actual damages." Orbit Elecs., Inc. v. Helm Instrument Co., 167 Ohio App. 3d

301, 313, 855 N.E.2d 91 (Ohio Ct. App. 2006) (quoting Kenty v. TransAmerica

Premium Insurance Co., 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995)).  An

action for civil conspiracy cannot be maintained unless an underlying tort is

committed. Avery v. City of Rossford, 145 Ohio App. 3d 155, 165, 762 N.E.2d

388 (Ohio 6th App. Dist. 2001) (citation omitted).  Further, under Ohio law, a

"conspiracy must be pled with some degree of specificity, and vague or conclusory

allegations that are unsupported by material facts will not be sufficient to state a

claim." Kovacic v. Cuyahoga County Dep't of Children & Family Servs., 2007 U.S.

Dist. LEXIS 50046, *57 (N.D. Ohio July 9, 2007) (quoting Avery, 145 Ohio App.

3d at 165).

    Four paragraphs comprise IPS's conspiracy claim.  The first paragraph simply

"repeats and realleges the prior paragraphs" and the fourth paragraph sets forth the

request for damages. Id. ¶¶ 89, 92.  The second paragraph contains the heart of

the charge, specifying that the "Physicians and Granger have, for their own

personal benefit, schemed to avoid [DICSC's] obligations under the [DICSC/IPS Agreement], Physicians' obligations under their employment contracts and Physicians' non-competition obligations." Id. ¶ 90. Finally, the third paragraph sets forth various assertions pertaining to the conspiracy claim, most of which are framed as supporting factual allegations,[11] although two of which are posited as alleged tort actions Id. ¶ 91i- j ("Tortiously interfering with the parties' performance of [DICSC's] obligations under the Agreement" and "[c]onverting [DICSC's] contracts with CMC and other facilities and the value, benefit and other rights accruing to Plaintiff as a result of [DICSC's] performance per the agreement of its contracts").

IPS's Memorandum in Opposition appears to assert that its conspiracy claim is hinged on the following unlawful acts: (1) the Physicians' tortious interference with the Agreement; (2) conversion; (3) Granger's breach of fiduciary duties to DICSC and its creditors; (4) Granger's piercing of DICSC's corporate veil; and (5) Granger's tortious interference with the Agreement. Doc. #26 at 20-21.[12] In their

---

[11]E.g., "[a]greeing that the non-competition provisions of [the Physicians'] contracts would not be enforced" and "[f]orming Dayton Newborn as a new entity pursuant to which Physicians would continue to provide medical services at the facilities at which [DICSC] had provided such services." Doc. #36 ¶ 92f, h.

[12]It is not clear whether IPS is asserting that these five acts are the underlying torts to support its conspiracy claim or that the facts that IPS uses to support these five wrongs, in other parts of its Amended Complaint, are also facts that are supportive of its conspiracy claim. The pertinent part of the Memorandum reads as follows:

Motion to Dismiss, the Defendants argue that, contrary to the Plaintiff's assertions on this point, the only potential conspiracy claims that might be inferred from the Amended Complaint are the following:  (1) a conspiracy to tortiously interfere with the DICSC/IPS Agreement, and (2) a conspiracy to convert the CMC contract and related agreements. Doc. #22 at 32.

The Court agrees that this Count of the Amended Complaint is not clearly written.  A fair reading of that document, within the previously described confines regarding pleading conspiracy claims with some degree of specificity, leads the Court to conclude that IPS was attempting to base its conspiracy claim on the following underlying tort actions:  (1) the Physicians' tortious interference with the Agreement; (2) conversion; and (3) Dr. Granger's tortious interference with the

---

Thus, although movants correctly point out that there must be an actionable wrong committed to support a conspiracy claim, they then proceed to ignore that actionable wrongs are clearly plead, in part, as Granger's breach of fiduciary duty, IPS'[s] veil-piercing claim against Granger, Granger's tortious interference with the Agreement, their own tortious interference with the Agreement and conversion. Ignoring the tort claims, movants attempt to recast IPS'[s] claim as a conspiracy to breach the Agreement and their employment agreements.  Movants' utter silence as to the wrongful acts alleged in the first [breach of fiduciary duty] and third [piercing the corporate veil] claims for relief and how those acts are tied with the conspiracy claim is implicit acknowledgment that the conspiracy claim is sufficiently alleged.

Doc. #26 at 21-22.  The language of the Memorandum is not binding on the Court, of course.  It is the language in the Amended Complaint that sets forth the parameters of IPS's claim and, thus, it is that document that will dictate the Court's analysis here.

Agreement.  Although some of the factual assertions might arguably relate to a claim for Granger's breach of fiduciary duty or Granger's piercing of DICSC's corporate veil, there is no language in Count Seven (the conspiracy claim) that implies that IPS intended to proceed, in the conspiracy context, on those grounds. See Doc. #36 ¶¶ 89-92.[13]  Thus, the Court will now analyze whether IPS's alleged conspiracy claims survive the Defendants' Motion to Dismiss, based on the Physicians' tortious interference with the Agreement, conversion and Dr. Granger's tortious interference with the Agreement.

> 1.    Conspiracy, as to (1) the Physicians' Tortious Interference with the DICSC/IPS Agreement, and (2) Conversion

As to the conspiracy claims pertaining to the Physicians' tortious interference with the DICSC/IPS Agreement and conversion, the Defendants argue that IPS has not stated valid underlying wrongful acts and, thus, its conspiracy claims must fail. Doc. #22 at 22-24; Doc. #27 at 6-10.  The Court agrees.  Given the Court's decision, above, to sustain the Defendants' Motion to Dismiss, as to the claims for the Physicians' tortious interference with the Agreement and conversion, and because IPS has offered no additional facts to demonstrate how Granger's involvement in the alleged conspiracies somehow transforms the

_____

[13]If IPS is, indeed, arguing that it intended to proceed on a conspiracy claim based on Granger's piercing of DICSC's corporate veil, it is unclear what legal theory it intended to use, since piercing the corporate veil is not a recognized tort action.

previously failed claims into valid claims, IPS's claim for conspiracy as to these underlying torts must fail.[14]

### 2. Conspiracy, as to Granger's Tortious Interference with Agreement

Finally, IPS alleges that the Defendants conspired with Dr. Granger to tortiously interfere with the DICSC/IPS Agreement. Ohio courts have recognized that "while a cause of action exists for conspiracy to tortiously interfere with a contractual relationship, the claim must involve two or more non-parties to the contract conspiring to induce a party to breach his contract," because "[i]t makes no sense to say that a party conspired to induce himself to breach a contract." Hicks v. Bryan Med. Group, Inc., 287 F. Supp. 2d 795, 813-14 (N.D. Ohio 2003) (quoting Wagoner v. Leach Co., 1999 Ohio App. LEXIS 3152 (Ohio 2nd App. Dist. July 2, 1999)) (internal quotation marks and alterations omitted). Thus, a tortious interference claim must implicate at least two non-parties to the contract in question, in order to be sustainable.

Dr. Granger was the sole shareholder, as well as an officer and director of DICSC. Doc. #36 ¶ 6. The Sixth Circuit has observed that, "[g]enerally, corporate officers are not capable of interfering with contracts to which their principal is

---

[14]Because of the Court's decision, on this point, it finds it unnecessary to delve into the Defendants' other arguments. See Doc. #22 at 30-32 (arguing, for example, that a party cannot be held liable for conspiring to breach his own contract); Doc. #27 at 6-10.

party." Tri-Med Fin. Co. v. National Century Fin. Enters., 2000 U.S. App. LEXIS

3659, **18-19 (6th Cir. Mar. 6, 2000) (citing Erebia v. Chrysler Plastic Products

Corp., 891 F.2d 1212, 1215-16 (6th Cir. 1989)).  IPS argues, however, that the

facts of this case come within the exception to that general rule, when a corporate

agent's actions are for his personal benefit rather than for the benefit of the

corporation. Doc. #26 at 22.

In order for a claim that a corporate officer tortiously interfered with his

principal's contract to survive, a plaintiff must plead specific facts demonstrating

that the officer's actions were not taken on behalf of his employer, but instead

benefitted him solely in a personal capacity. See West v. Visteon Corp., 367 F.

Supp. 2d 1160, 1164 (N.D. Ohio 2005) (citing Miller v. Wikel Mfg. Co., 46 Ohio

St. 3d 76, 79, 545 N.E.2d 76 (1989)); see also Tri-Med Fin. Co., 2000 U.S. App.

LEXIS 3659 at *19 (affirming dismissal of plaintiff's claim of tortious interference

against corporate officers, because plaintiff failed to plead specific facts showing

defendants acted for their own personal benefit).

In support of its contention that Dr. Granger acted for his own personal

benefit, rather than on behalf of DICSC, IPS makes the following assertions:

- Granger acted for his own personal benefit in dissolving [DICSC] to
  have it cease doing business to circumvent obligations under the
  Agreement (citing Doc. #36 (Am. Compl.) ¶¶ 55-56).

- Granger, for his own benefit, failed to provide physicians to the
  medical facilities (citing id. ¶ 58).

- For his own personal reasons, [Granger took action] to avoid

29

payment obligations that would ultimately fall on him personally (no cite).

• [Granger] made his decision to leave [DICSC] for his own personal business and rendered [DICSC] incapable of performing its obligations under the Agreement (no cite).

Doc. #26 at 23.

Assuming, *arguendo*, that suit can properly be brought against Dr. Granger for tortious interference, as a corporate agent whose actions were for his own personal benefit, the Amended Complaint still does not survive the Defendants' Motion to Dismiss, on this point. As the Court explained in detail above, see *supra* Section III(A), in order for a claim of tortious interference to survive a Motion to Dismiss, a complaint must allege that the defendant had a specific intent to harm when he interfered with a contract. Super Sulky, Inc. v. United States Trotting Ass'n, 174 F.3d 733, 742-43 (6th Cir. 1999) (citing Restatement (Second) of Torts § 767 cmt. c). An interference based on the protection of one's business interests is insufficient.

None of the allegations pertaining to Dr. Granger's interference, as set forth above, contain the requisite inference that he interfered with the DICSC/IPS Agreement with a specific intent to harm IPS. On the contrary, the record indicates that Dr. Granger's actions were motivated by his decision to leave his medical practice and pursue a teaching profession. When none of his employees expressed an interest in buying DICSC from him, he took steps to dissolve the corporation. Dr. Granger may or may not have moved forward in the most prudent

30

or conscientious manner, especially with regards to IPS, but nothing in the Amended Complaint can be read to imply that his actions were taken with a specific intent to harm IPS.

As the Sixth Circuit determined in Wright v. MetroHealth Medical Center, 58 F.3d 1130 (6th Cir. 1995), as detailed above, if the alleged interloper's motivation is not based on a specific intent to harm, then the claim must fail.  So, IPS's claim must fail, in this case.  Thus, if Dr. Granger did not tortiously interfere with the Agreement, the Defendants could not have conspired with him to do the same.

Because the factual allegations are not sufficient to raise IPS's right to relief above the speculative level on any of its conspiracy claims, the Defendants' Motion to Dismiss (Doc. #22) is SUSTAINED, as to Count VII.


E.    Accounting (Count VIII)

As its eighth claim for relief, IPS asserts a right to an accounting "as a result of [the Defendants'] efforts to divert assets, including accounts receivable." Doc. #36 ¶ 94.  In its Memorandum in Opposition to the Plaintiff's Motion to Dismiss, IPS asserts that it is entitled to an accounting, because its Complaint "states a claim for breach of fiduciary duty against Granger, a claim that supports an action for an accounting," and that "[the Defendants'] participation in the wrongful acts underlying the claims allow such a claims [sic] to be maintained against [the Defendants]." Doc. #26 at 32.  The Defendants challenge whether IPS's Amended

31

Complaint alleges a claim for which the law provides an accounting. Doc. #22 at 25.

The Court agrees with the Defendants.  In Ohio, the right to an accounting is dependent on a right to a judgment for the underlying wrongful act. De Cumbe v. Krewson, 53 Ohio App. 486, 490, 5 N.E.2d 789 (Ohio 8th App. Dist. 1936). Thus, a plaintiff that does not have an underlying claim for wrongful conduct is not entitled to the remedy of an accounting. See Davis v. DCB Fin. Corp., 259 F. Supp. 2d 664, 674 (S.D. Ohio 2003) (finding plaintiff not entitled to accounting, because it did not allege that "any of the directors or any other persons improperly embezzled, appropriated or took possession of funds belonging to [the plaintiff]"). Because the Court has previously dismissed all of the claims upon which IPS attempts to base its accounting claim, the Defendants' Motion to Dismiss (Doc. #22) is SUSTAINED, as to Count VIII.


F.    Successor Liability (Count IX)

As its ninth and final claim for relief, IPS seeks a "declaratory judgment that Dayton Newborn is the successor to the rights, duties and obligations of [DICSC] and/or Physicians and is further entitled to a judgment against Dayton Newborn for all sums for which Defendants may be found liable herein." Doc. #36 ¶¶ 98-102. The Court finds it unnecessary to reach the merits of this claim, since, as previously discussed, the Plaintiff has not set forth valid claims against any of the

32

Defendants. Thus, the Defendants' Motion to Dismiss (Doc. #22) is SUSTAINED, as to Count IX.


IV.     MOTION FOR PROTECTIVE ORDER

Given the Court's decision herein, in favor of the Defendants on all counts, the Defendants' Motion for a Protective Order (Doc. #28), barring IPS from pursuing discovery against them, is OVERRULED, as moot.


V.      CONCLUSION

The Motion of Defendants Yohannan, Rone, Haas and Dayton Newborn Care Specialists, Inc. to Dismiss (Doc. #22) is hereby SUSTAINED, while the Defendants' Motion for a Protective Order (Doc. #28) is OVERRULED, as moot.


March 24, 2008

                                          /s/ Walter Herbert Rice
                                        WALTER HERBERT RICE, JUDGE
                                        UNITED STATES DISTRICT COURT


Copies to:
Counsel of record

33